| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL CASE NO. |
| | : | 3:10-cr-14 (JCH) |
| v. | : | |
| | : | |
| KERRY MARSHALL, | : | JULY 14, 2011 |
|     Defendant. | : | |

**RULING RE:  DEFENDANT'S POST-TRIAL MOTIONS**
**(DOCS. NO. 139, 140, 141, 144, 146)**

## I.  INTRODUCTION

The defendant, Kerry Marshall, was convicted by a jury on each of the counts contained in an Indictment against him:  twenty counts of Bank Fraud in violation of 18 U.S.C. § 1344(1) and one count of Access Device Fraud in violation of 18 U.S.C. § 1029(a)(5).  The trial took place over four days, and the jury returned its verdict on the morning of the fifth day. Kerry Marshall waived his right to counsel and proceeded pro se, with court appointed stand-by counsel.

Following the verdict, Marshall timely filed a Motion to Arrest Judgment (Doc. No. 139), Motion for a Judgment of Acquittal (Doc. No. 140), and Motion for a New Trial (Doc. No. 141).  The government filed memoranda in opposition (Doc. Nos. 144, 146), and Marshall then filed a "Motion to Arrest Judgment (Supplement)" (Doc. No. 145), and a "Motion for a New Trial Supplement" (Doc. No. 147).  Although filed as motions, Marshall's two supplemental filings do not seek any relief other than that sought in the previous motions, and they are, in substance, reply memoranda to the government's opposition memoranda.  For the reasons that follow, Marshall's Motions are denied.

1

## II.    EVIDENCE AT TRIAL[1]

The government introduced the testimony of seven individuals (the "individual victims") who incurred unauthorized charges on their credit card accounts through the use of stolen credit card convenience checks.  The convenience checks were made payable to Kerry Marshall or to Truth Be Told Publications, a business associated with Marshall.  None of the individual victims had ever done business with Kerry Marshall or Truth Be Told, and only one of them recognized Kerry Marshall.  All seven individual victims testified that the signatures on the convenience checks were forgeries.

The government introduced documentary evidence showing that twenty forged convenience checks issued to the individual victims were deposited at three financial institutions (the "victim banks")--Connex Credit Union ("Connex"), JP Morgan Chase ("Chase"), and Bank of America--into accounts held in the name of Kerry Marshall or Truth Be Told.  This documentary evidence included records of bank transactions, the twenty endorsed checks bearing stamps indicating that they had been processed by the banks, and deposit slips accompanying those checks.  All twenty checks were made out to Kerry Marshall or Truth Be Told, and were endorsed by Kerry Marshall.

The government introduced testimony from representatives of each of the three victim banks.  Niddrie Rowe, a representative from Connex, testified about the procedures for opening an account at Connex and about Connex's requirement that an

_____

[1] The evidence may be stated in a light favorable to the government and without assessing the credibility of witnesses.  See United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992) (On a Rule 33 motion for new trial, courts "must defer to the jury's resolution of the weight of the evidence and the credibility of witnesses" unless "exceptional circumstances can be demonstrated."); United States v. Puzzo, 928 F.2d 1356, 1361 (2d Cir. 1991) (On a Rule 29 motion for judgment of acquittal, the court "view[s] the evidence in the light most favorable to the government and construe[s] all possible inferences in its favor.").

applicant provide two forms of identification.  She identified documents from Connex, including an application for an account (Gov. Exh. 26) and a photocopy of Marshall's New York driver's license (Gov. Exh. 27) that were used to open the account.  Rowe identified four checks deposited into the account held in the name of Kerry Marshall— the four checks charged in Counts One through Four—and she also testified concerning statements showing the deposit activity and withdrawals on that account.  Rowe testified that the monthly statements and other correspondence relating to the account were mailed to Kerry Marshall at 542A Seaview Avenue in Staten Island.  Rowe also testified that using the transaction information maintained by Connex, she requested photographs taken by bank surveillance cameras at the times and branch locations when teller transactions involving Marshall's account occurred.  She identified the photographs she received from the operations department pursuant to her request (Gov. Exhs. 30-33), and she testified that she recognized the branch locations in the photographs and that each appeared to depict an individual conducting a transaction at Connex.  According to Rowe, Connex was exposed to the possibility of a financial loss as a result of the deposits of the forged checks, and in fact sustained a loss.

On cross-examination, Rowe testified that she had compared the photographs to Marshall's driver's license, and compared the handwriting on the checks and deposit slips to the handwriting on the account application, and that she had concluded that the person who deposited the checks was Kerry Marshall.

Denise Stromp, a representative from Chase, testified concerning the opening of an account at Chase in the name of Kerry Marshall.  She testified that Chase required two forms of identification from a person opening an account, and she testified that one

of the forms used was a Connecticut driver's license for Kerry Marshall, as indicated on the account opening documents. She identified checks deposited into the account at Chase—the checks charged in Counts Five through Eight of the Indictment—and she identified the deposit slips used to deposit the checks. She identified account statements pertaining to the account, and testified that they were mailed to Kerry Marshall at 542A Seaview Avenue in Staten Island. Stromp testified that, as a result of the depositing of the forged convenience checks, Chase was exposed to the risk of, and in fact sustained, a financial loss.

Mark Harris, a representative from Bank of America, testified concerning the operation of an account at Bank of America held in the name of Truth Be Told Publications. Harris identified twelve forged convenience checks that were deposited into the Truth Be Told account—the twelve checks charged in Counts Nine through Twenty of the Indictment—and he identified the deposit slips that went with those checks. Harris testified that the monthly statements were mailed to Marshall at 1 Campbell Avenue in West Haven, Connecticut. Harris testified that Bank of America was exposed to a risk of loss as a result of the deposits of the forged convenience checks.

In addition to these witnesses, Nick Suriani, a representative from MBNA/Bank of America, testified concerning the use of convenience checks generally, and the fact that the checks contained credit card account numbers on the face of the checks that allowed account holders to access their credit card lines of credit using the checks.

Representatives or custodians of records for the landlords at the 542A Seaview Avenue and 1 Campbell Avenue apartment buildings testified that Marshall leased

apartments at those locations, and identified applications and lease documents for both apartments signed by "Kerry Marshall."

Representatives from the Federal Deposit Insurance Corporation and the National Credit Union Administration testified that the victim banks were federally insured at the time the forged convenience checks were deposited.

The case agent, United States Postal Inspector Robert Diaz, testified that he executed a search warrant at Marshall's residence at 542A Seaview Avenue, Staten Island, and identified several items seized during the search. These included items of mail linking Marshall to the Seaview Avenue, Campbell Avenue, and 157 Fountain Street addresses; copies of Marshall's New York and Connecticut driver's licenses linking him to the Staten Island and 157 Fountain Street addresses; Marshall's business card identifying him as the CEO of Truth Be Told Publications; correspondence from Bank of America and Chase to Marshall and Truth Be Told; Connex account statements and receipts for the Connex account involved in Counts One through Four, as well as empty Connex ATM deposit envelopes; a carbonless copy of the Chase deposit slip for the check charged in Count Seven; and a credit card statement for an account held by one of the individual victims, whose forged convenience checks are the basis for eight of the counts charged in the Indictment. Diaz also identified a Post Office Box application submitted to a Post Office located at 95 Fountain Avenue in New Haven, for an individual named Kerry Marshall and a business described as Truth Be Told Publications. Postal Inspector Diaz testified a second time, as the last witness in the Government's case-in-chief, concerning composite exhibits that juxtaposed handwriting on the forged convenience checks with the handwriting on documents seized from

Marshall's apartment during the search.

Marshall testified in his defense.  On cross-examination, Marshall admitted that he lived at the 542A Seaview Avenue and 1 Campbell Avenue locations.  Marshall admitted that the handwriting and signatures on the applications and lease documents for those apartments were his.  Marshall admitted that the Truth Be Told Publications business card seized during the search was his, and that he was the individual in the photograph on that card.  Marshall also admitted that the copies of driver's licenses seized during the search were copies of his New York and Connecticut driver's licenses.  Marshall also admitted that he had obtained the P.O. Box at the Fountain Street Post Office, and that he had ties to the 157 Fountain Street address.

On redirect examination, Marshall testified that on several occasions he had gone to Connex Credit Union branches to cash checks from his business clients that were written on Connex accounts, and that these transactions might account for the fact that he was photographed by Connex surveillance equipment.

## III.    MOTION TO ARREST JUDGMENT

"Upon the defendant's motion or on its own, the court must arrest judgment if: (1) the indictment or information does not charge an offense; or (2) the court does not have jurisdiction of the charged offense."  Fed. R. Crim. P. 34(a).  "These are the only two circumstances in which arrest of judgment is proper under the rule."  United States v. Peters, 03-cr-211S, 2007 WL 3408464, *1 (W.D.N.Y. Nov. 15, 2007) (citing United States v. Zisblatt, 172 F.2d 740, 741 (2d Cir. 1949); United States v. Genao, 361 F. Supp. 2d 224, 228 (S.D.N.Y. 2005); and United States v. Earls, No. 03-cr-0364, 2004 WL 1488524, *1 (S.D.N.Y. July 2, 2004)).

6

In his Motion to Arrest Judgment, Marshall argues that the Indictment in this case is a "nullity" because it is an "indisputable fact" that the Indictment was neither presented to a grand jury nor endorsed by the grand jury foreperson.[2]  Mot. to Arrest Judgment at 3.  Marshall made the same argument in a Motion to Dismiss filed on January 19, 2010 (Doc. No. 8) and a second Motion to Dismiss filed on May 7, 2010 (Doc. No. 42).  The court (Covello, J.) denied both Motions in a written Ruling dated August 20, 2010 (Doc. No. 57).  On August 30, 2010, Marshall filed a Motion for Reconsideration (Doc. No. 59) raising the argument again.  The court (Covello, J.) granted that Motion insofar as it sought reconsideration, but determined, upon reconsideration, "that its original rulings shall remain unchanged."  Order (Doc. No. 65). After the case was transferred to the undersigned, Marshall raised the issue again in connection with his "Motion for Express Order" (Doc. No. 81), which was denied on the record on March 7, 2011.  See Minute Entry (Doc. No. 82).

Marshall's concerns about the Indictment appear to stem from the fact that a copy of the Indictment on the electronic docket in this case (Doc. No. 1) does not bear the original signatures of the grand jury foreperson or the prosecutors, but instead, "/s/" is typed on each signature line.  With its Opposition to Marshall's pre-trial motions, the government filed a copy of the Indictment bearing the signature of the grand jury foreperson, albeit with a black bar redacting the majority of that signature and bearing the unredacted signature of three prosecuting attorneys.  See Doc. No. 46-1.  This copy

---

[2] Marshall also argues that the government failed to prove that Connex was federally insured and that the court, therefore, lacks jurisdiction.  Mot. to Arrest Judgment at 6-7.  Rule 34 is not the proper vehicle for a challenge to the sufficiency of the evidence.  See United States v. Sisson, 399 U.S. 267, 281 (1970) ("[A] judgment can be arrested only on the basis of error appearing on the 'face of the record,' and not on the basis of proof offered at trial . . . .").  The court addresses the sufficiency of the evidence on this element in connection with Marshall's Motion for Judgment of Acquittal.  See infra at 13-14.

of the Indictment bears the stamp and signature of the Deputy Clerk certifying that it is a true copy of the document on file with the court. Id. at 10. The court (Covello, J.) reviewed this certified copy of the Indictment and ruled:

> The government has attached a certified copy of the indictment to its response, and after review of the document, the court concludes that the defendant's concerns are unwarranted. The indictment was signed by representatives from the United States Attorneys office and the grand jury foreperson and was returned before Magistrate Judge Joan G. Margolis. The defendant's motion to dismiss the indictment on these grounds is, therefore, denied.

Ruling (Doc. No. 57) at 8. Having reviewed this copy of the Indictment again, the court again reaches the same conclusion. There is no basis for Marshall's belief that the Indictment was not presented to the grand jury or returned with the concurrence of 12 grand jurors.[3] Therefore, Marshall's Motion to Arrest Judgment is denied.

## IV. MOTION FOR JUDGMENT OF ACQUITTAL

### A. Legal Standard under Fed. R. Crim. P. 29(a)

Rule 29(a) of the Federal Rules of Criminal Procedure provides in relevant part

---

[3] If Marshall is arguing that the case should be dismissed simply because the copy of the Indictment bearing these signatures was not filed as the Indictment on the electronic docket, he is incorrect. The practice of removing those signatures is expressly permitted by this District's Electronic Filing Policies and Procedures, which are available at http://www.ctd.uscourts.gov/cmecf/PDF%20 Documents/policies_n_procedures.pdf (last visited July 13, 2011). Section XI.C provides that "documents signed by a grand jury foreperson . . . or [a] federal officer or agent" may be filed "as PDF documents containing a '/s/' signature." The Electronic Filing Order in this case (Doc. No. 2) requires compliance with these Policies and Procedures.

Even if the District's rules did not permit this practice, the case law that Marshall cites shows that failure to docket the copy with the original signature would be, at most, a "technical irregularity" and not a basis for dismissal. See Hobby v. United States, 468 U.S. 339, 345 (1984) ("Even the foreman's duty to sign the indictment is a formality, for the absence of the foreman's signature is a mere technical irregularity that is not necessarily fatal to the indictment.") (citing Frisbie v. United States, 157 U.S. 160, 163-165 (1895)); see also United States v. Swain, 08-cr-1175 (JFK), 2010 WL 23317, *1 (S.D.N.Y. Jan. 5, 2010) ("Even assuming that Defendant's allegations [that the indictment was not signed] were true, noncompliance with these technical requirements would not carry the level of prejudice necessary to warrant dismissal.").

that, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Upon a motion pursuant to Rule 29(a), "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979) (emphasis in original); <u>see also</u> <u>United States v. Peyton</u>, 159 F.3d 49, 56 (2d Cir. 1998) ("The ultimate question is not whether <u>we believe</u> the evidence adduced at trial established the defendant's guilt beyond a reasonable doubt, but whether <u>any rational trier of fact could so find</u>." (emphasis in original)).

A defendant challenging the sufficiency of the evidence on a motion for a judgment of acquittal "bears a very heavy burden." <u>United States v. Gonzalez</u>, 110 F.3d 936, 940 (2d Cir. 1997) (quotation omitted). The evidence must be viewed in the light most favorable to the government, and all inferences must be drawn in the government's favor. <u>United States v. Autuori</u>, 212 F.3d 105, 114 (2d Cir. 2000). The "government need not negate every theory of innocence." <u>Id.</u> The jury may properly reach its verdict based upon inferences drawn from circumstantial evidence, and pieces of evidence must be viewed in conjunction, not isolation. <u>See</u> <u>United States v. Mariani</u>, 725 F.2d 862, 865-66 (2d Cir. 1984).

B.    <u>Knowingly Depositing Forged Checks May Constitute Bank Fraud</u>

Marshall was found guilty on Counts One through Twenty of the Indictment, each of which charge him with bank fraud in violation of 18 U.S.C. § 1344(1). "In order to show bank fraud, the government must prove that defendant '(1) engaged in a course of conduct designed to deceive a federally chartered or insured financial institution into

releasing property; and (2) possessed an intent to victimize the institution by exposing it to actual or potential loss." United States v. Crisci, 273 F.3d 235, 239-40 (2d Cir. 2001) (quoting United States v. Barrett, 178 F.3d 643, 647-48 (2d Cir. 1999)).  "The government must prove that a bank was 'an actual or intended victim' of defendant's scheme, and defendant's knowing negotiation of a bank check bearing a forged endorsement satisfies this requirement." Crisci, 273 F.3d at 240 (citing United States v. Laljie, 184 F.3d 180, 189 (2d Cir. 1999) and Barrett, 178 F.3d at 648).

Marshall notes that the Second Circuit has held that a "course of conduct consisting of simply depositing checks into a bank account where the depositor knows that he/she is not entitled to the funds does not alone constitute false or fraudulent pretenses or representations" as required for bank fraud. United States v. Rodriguez, 140 F.3d 163, 168 (2d Cir. 1998).  In Rodriguez, the Second Circuit vacated a bank fraud conviction that had been based on the defendant's involvement in a deceptive scheme to induce a publishing company to issue checks for payment of fraudulent invoices.  See id. at 165.  In that case, a duly authorized representative of the publishing company issued and executed the checks, albeit as a result of fraud directed at the publishing company, and the defendant then deposited these valid, but fraudulently obtained, checks at a federally insured financial institution.  Id.  Although these facts may constitute fraud against the publishing company, the Second Circuit held that they were not sufficient to establish fraud directed at the bank.  See id. at 168-69.  Marshall argues that, in this case, proof that forged checks were deposited is not sufficient to establish false pretenses or material misrepresentations directed toward the victim banks.

Marshall's argument fails because the Second Circuit has held that knowingly negotiating a check bearing a forged endorsement—as was proven here—may be sufficient to establish bank fraud. See Crisci, 273 F.3d at 240 ("[A] rational jury could find that Crisci intended to harm a bank when he cashed seventeen fraudulent checks with forged endorsements . . . ."); Laljie, 184 F.3d at 189 ("Presentation to a financial institution of a fraudulent document that exposes the institution to a potential loss if the document be honored and funds be released, such as a forged or altered document, is within the scope of § 1344."); Barrett, 178 F.3d at 648 (distinguishing Rodriguez because "[a]n essential step in Barrett's fraudulent scheme was his act of forging endorsements on the checks he obtained from Schumacher and cashing those checks at the Bank of New York"); see also United States v. Stavroulakis, 952 F.2d 686, 695 (2d Cir. 1991) (holding that a defendant who traffics in blank stolen checks intends to victimize banks because the checks eventually would be presented to a drawee bank with a forged signature).

Marshall does not appear to contest that the checks at issue here were forged, nor does he argue that there was any evidence indicating that they were authorized and signed by the payor, like the checks in Rodriguez. The uncontradicted testimony of each individual victim supports the conclusion that each of the convenience checks at issue was not made out by the individual victim, or by anyone authorized by them, and therefore was forged.

C.    The Evidence Was Sufficient For A Rational Trier of Fact To Conclude That Marshall Committed Bank Fraud Against Connex As Charged In Counts One Through Four

In his challenge to the sufficiency of the evidence on Counts One through Four,

Marshall argues that the Government did not produce any witness who personally interacted with him when the Connex account was opened. However, the government submitted the Connex account application (Gov. Exh. 26) and the photocopy of Marshall's license used to support the application (Gov. Exh. 27). Niddrie Rowe testified that Connex representatives were required to verify an applicant's identity, and the photocopy of Marshall's license confirmed that this was done. The jury could reasonably conclude that the handwriting on the Connex account application was consistent with the handwriting on documents that Marshall admitted were signed and written by him, including his applications for the apartments in Staten Island (Gov. Exhs. 41 and 42) and West Haven (Gov. Exhs. 86 and 87). Rowe testified that the account statements were mailed to Marshall's apartment at 542A Seaview Avenue, a fact confirmed by the address shown on the statements themselves (Gov. Exhs. 35-40, 49). A July 2006 Connex statement (Gov. Exh. 49), Connex cash deposit voucher (Gov. Exh. 50), and Connex ATM deposit envelopes (Gov. Exh. 70) were found in that apartment. This evidence was sufficient to permit the jury to conclude that Marshall opened and used the Connex account.

Marshall also argues that, "the government failed to produce any witness, eyewitness or otherwise who testified at trial to having transacted business across the counter with the Defendant or testified that a withdrawal took place and they handled the withdrawal." Mot. for Acquittal at 15. However, this was not necessary. The government submitted account statements showing both deposits into and withdrawals out of the account (Gov. Exhs. 35-40). The evidence showed that the checks deposited into the Connex account were made out to and endorsed by Kerry Marshall (Gov. Exhs.

1-4).  Moreover, the bank surveillance photographs show Marshall transacting business at the exact branch, date, and time that transactions using the account occurred.  This evidence was plainly sufficient to permit the jury to draw the reasonable inference that Marshall opened the Connex account, knowingly deposited forged convenience checks into the account, and was aware of all of the transactions conducted through the account.

Marshall argues that the jury was "left . . . to guess" whose handwriting was on Connex documents, because no handwriting samples were ever submitted to an expert, nor were any exemplars evaluated.  Mot. for Acquittal at 18.  However, Marshall admitted that certain documents, such as his lease documents, were written and signed by him.  "A jury may compare a known handwriting sample with another sample to determine if the handwriting in the latter is genuine."  United States v. Rhodis, 58 F. App'x 855, 856-857 (2d Cir. 2003); see Fed. R. Evid. 901(b)(3) (trier of fact may compare handwriting specimens which have been authenticated with others); Fed .R. Evid. 901(b)(4) (distinctive characteristic of offered item may be taken in conjunction with circumstances).  "The law does not require 'a questioned document examiner to vouch for the similarity of handwriting,' but instead, allows the jury to determine for itself whether the same person's handwriting appears on two documents."  United States v. Alvarez-Farfan, 338 F.3d 1043, 1045 (9th Cir. 2003).

Marshall further claims that the Government failed to establish that Connex was federally insured at the time of the offense.  John Miscikoski, an examiner from the National Credit Union Administration, testified that Connex has been federally insured continuously since its founding.  In addition, Niddrie Rowe testified that she had seen

signs at Connex concerning this fact, and statements on admitted Connex documents expressed that Connex was federally insured. This evidence was sufficient to permit the jury to conclude that the deposits of Connex were federally insured at the time of the offense. See United States v. Pascarella, 84 F.3d 61, 71 (2d Cir. 1996) (holding that an FBI agent's uncontradicted testimony that the bank was FDIC insured and bank statements stating the same were sufficient evidence of federal insurance).

Finally, Marshall argues that, because he testified that he had submitted a claim that his identity was stolen, "it should have created pause in the minds of the jury." Mot. for Acquittal at 17. The jury is the finder of fact, and it was free to make its own determination of the credibility and significance of this testimony. Based upon all of the evidence, the jury could quite reasonably conclude that Marshall opened the Connex account, that the deposits in Connex's accounts were federally insured, that Marshall knowingly deposited forged convenience checks into the account, and that Marshall intended to expose the bank to a risk of loss.

D.    The Evidence Was Sufficient For A Rational Trier of Fact To Conclude That Marshall Committed Bank Fraud Against Chase As Charged In Counts Five Through Eight

Marshall's arguments regarding the sufficiency of the evidence on Counts Five through Eight are similar to his claims concerning Connex. Marshall argues that no witness testified to having been personally involved in opening the account. However, the bank's business records, admitted through a custodian of records, establish that the account was opened in the name of Kerry Marshall by an individual using Marshall's Connecticut driver's license and West Haven address. Significantly, it was also established that the address on the Chase account was changed to 524A Seaview

Avenue, Staten Island at roughly the same time that Marshall moved to Staten Island, and Marshall admitted that date when he testified on cross-examination that he lived in each of those locations and signed the rental documents. Denise Stromp, a representative of Chase, testified concerning Chase's requirement that Chase representatives verify the identity of individuals opening accounts. At trial, Marshall attacked Stromp's testimony on the basis that she had no first-hand knowledge regarding the opening of his Chase account or the subsequent transactions on that account. The jury was free to weigh or disregard this point as it saw fit. The jury could reasonably and rationally conclude that Marshall himself opened the Chase account, deposited forged convenience checks into the account, made withdrawals against those deposits, and changed the address on the account when he moved.

Marshall also argues that the government "adduced nothing that the eyes can see which demonstrated any knowing or otherwise attempt was made by the Defendant to defraud Chase Bank." Mot. for Acquittal at 20. However, the government submitted the forged checks and deposits slips, each of which bears handwriting consistent with Marshall's admitted handwriting samples, and a carbon copy of the handwritten deposit slip for the check charged in Count Seven (Gov. Exhs. 7A and 7B), which was found in Marshall's apartment, along with other Chase receipts (Gov. Exh. 56) and correspondence (Gov. Exh. 68) pertaining to the account. This evidence is sufficient to support the jury's verdict in this regard.

Marshall argues that the evidence established "[j]ust that he is loading money in a checking account that nobody has identified as belonging to him." Mot. for Aquittal at 20. This ignores the fact that the account was opened in his name, with his driver's

15

license, and with the account statements being sent to his address. Furthermore, a rational trier of fact could reasonably conclude that only the owner of the Chase account had any incentive to deposit the checks into that account. In short, there was more than sufficient circumstantial and documentary evidence from which the jury could rationally find Marshall guilty beyond a reasonable doubt.[4]

> E. The Evidence Was Sufficient For A Rational Trier of Fact To Conclude That Marshall Committed Bank Fraud Against Bank of America As Charged In Counts Nine Through Twenty

Marshall next claims that the evidence was insufficient to establish that he committed bank fraud against Bank of America, as alleged in Counts Nine through Twenty. Bank of America's representative, however, identified forged convenience checks payable to Truth Be Told, along with deposits slips for each check, each of which was deposited in the Bank of America account. Each of these checks and deposit slips were made out in handwriting consistent with Marshall's admitted handwriting samples, and each check was endorsed by Marshall.

Eight of the checks belonged to R.P., who lived at the apartment building at 157 Fountain Street in New Haven, who recognized Marshall at trial, and who testified that he remembered Marshall living at that address. R.P.'s credit card account statement was found in Marshall's Staten Island apartment. Another check (Gov. Exh. 19) belonged to J.H., who lived at the same apartment complex in West Haven as Marshall.

---

[4] Marshall also reiterates his argument concerning the fact that, in the search warrant inventory, Inspector Diaz did not itemize each document seized during the search, and that key items of evidence were not specifically mentioned. Mot. for Acquittal at 20-21. Marshall suggests that the jury should not have believed that Diaz took those items during the search. See id. Inspector Diaz testified concerning his inventory procedures and the search, and the jury appears to have found his explanation credible. It is the role of the jury to make such determinations, and the court will not second guess the jury.

All of the Bank of America account statements were mailed to Marshall's apartment at 1 Campbell Avenue in West Haven, and a Bank of America account statement (Gov. Exh. 69) was seized during the search of Marshall's Staten Island apartment.

Marshall admitted that the business card showing him to be the CEO of Truth Be Told was his, and that the photograph on the card was a picture of him. Numerous other documents linking Marshall to Truth Be Told were found during the search of Marshall's Staten Island apartment. Marshall admitted that he had filled out the application for the post office box for Truth Be Told.

Marshall testified concerning the settlement of his small claims case against Bank of America. A paralegal from Bank of America testified that the case was settled for nuisance value, without consideration or knowledge of the forged convenience checks. The jury was thus able to consider Marshall's arguments on this issue and was free to conclude that the settlement in no way undermined the evidence that Marshall had acted to defraud Bank of America.

In sum, the evidence was sufficient for a rational trier of fact to conclude that Marshall had opened the Bank of America account in his business's name and that he knowingly deposited the forged convenience checks made out to his business, with the intent to expose Bank of America to a risk of loss.

F.     The Evidence Was Sufficient for a Rational Jury to Conclude that Marshall
       Committed Access Device Fraud

Marshall's sufficiency claim concerning Count Twenty-One of the indictment, charging access device fraud in violation of 18 U.S.C. § 1029(a)(5), is unpersuasive. Marshall's argument on this count reiterates his assertion that he "was not identified as

17

effecting any transaction by any testimony or evidence happening inside any bank at the relevant times . . . ."  Mot. for Acquittal at 23.  As described above, however, the evidence was sufficient for a rational jury to conclude that Marshall had knowingly and with the intent to defraud deposited forged credit card convenience checks (which bear the credit card account numbers used to access the line of credit attached to the cards) with an aggregate value well in excess of $1,000 during a 1-year period.  The bank records; the testimony of the representatives from the banks; the testimony from the credit card account holders; the handwriting on the checks; the photographs of Marshall at Connex; the documents seized in Marshall's apartment; and the evidence that the bank accounts were in Marshall's name or the name of his business, with addresses used by Marshall; all provided a firm basis for the jury to identify Marshall as the person who used the forged checks to access the credit card accounts.  Therefore, Marshall's sufficiency claim on this count is without merit.

## V.      MOTION FOR NEW TRIAL

In his Motion for New Trial, Marshall claims that "a miscarriage of justice has clearly occurred in light of the gross perjured testimony, witness coaching, and <u>Brady</u> violation."  Mot. for New Trial at 1.  Federal Rule of Criminal Procedure 33(a) gives the court discretion to order a new trial "if the interest of justice so requires."  However, the Second Circuit has cautioned that this "discretion should be used sparingly."  <u>United States v. Sanchez</u>, 969 F.2d 1409, 1414 (2d Cir. 1992).

> The test is whether "it would be a manifest injustice to let the guilty verdict stand."
>
> Manifest injustice cannot be found simply on the basis of the trial judge's determination that certain testimony is

> untruthful, unless the judge is prepared to answer "no" to the
> following question: "Am I satisfied that competent,
> satisfactory and sufficient evidence in this record supports
> the jury's finding that this defendant is guilty beyond a
> reasonable doubt?" In making this assessment, the judge
> must examine the totality of the case. All the facts and
> circumstances must be taken into account. An objective
> evaluation is required. There must be a real concern that an
> innocent person may have been convicted. It is only when it
> appears that an injustice has been done that there is a need
> for a new trial "in the interest of justice."

Id. (citation and footnote omitted). Thus, the occurrence of perjury does not necessarily

warrant a new trial. Id. ("[M]otions for a new trial based on the identification of perjured

testimony should be granted only with great caution and in the most extraordinary

circumstances.").

A.    Alleged Perjury and Witness Coaching

Marshall claims that one of the government's witnesses, Niddrie Rowe,

committed perjury and was improperly coached during her testimony regarding the

photographs obtained from Connex's security cameras. Marshall's allegations are

based largely upon his own mistaken belief that Rowe testified on direct examination

that she obtained the film from a Connex employee named Brian Woodward.

On direct examination, Rowe testified that she obtained the film from Connex's

"operations" department and that she knew a Connex employee named Brian

Woodward who worked in operations. Trial Transcript ("Tr.") at 238-39. However, she

did not testify that she received the film from Brian Woodward. See id.

> Q.  Did you request any -- what do you call that surveillance
> equipment?  Do you have a term that use to refer to it?
>
> A.  I ask them if I can get the film from the branches and
> date and time of the teller transaction and describe the

19

member from their I.D.

Q.  And who would you call at Connex to request that information?

A.  I would send that to operations.

Q.  Do you know Brian Woodward?

A.  Yes.

Q.  Does he work in operations?

A.  Yes.

Q.  Did you do that in this case, the collection matter you were working on concerning Kerry Marshall?

A.  Yes. I would have send it to operations.

Id.

The evidence showed that Brian Woodward was not employed at Connex at the time that Rowe claimed to have obtained the photographs.  Brian Woodward had been a government witness earlier in the trial, and he testified generally about Connex's operations department, Connex's security cameras, and the practices of Connex with regard to those cameras and photographs.

On cross-examination, Marshall apparently mistakenly believed that Rowe had testified that she obtained the film from Brian Woodward, and he sought to emphasize that this testimony could not have been accurate.  However, when Marshall began this line of questioning, he mistakenly referred to Brian Woodward as "Bob Woodward." Rowe consistently responded that she had, in fact, received the film from an employee named Bob, and she consistently stated that Bob's last name was not Woodward:

Q.  On yesterday under direct by the government you suggested that Bob Woodward gave you the film?

A.  Bob.  You are absolutely right.  It wasn't Woodward.  I didn't mention Bob.  I wasn't asked that question.

Q.  It was Bob that gave it to you?

A.  He was the IT manager at that point but I believe Pattie Ray looked up the film.

*        *        *

Q.  And you are certain, you are certain that Bob Woodward was the person that got involved with getting you film even if he didn't hand it to you.  He was involved with getting you film?

A.  His name wasn't Woodward but it was Bob who was in charge of IT.  I would have e-mailed the order for the film.  He may have picked it up, looked it up.  Probably looked it up and printed it.  That's how it usually works.

Q.  Did he get remarried or something?

A.  I don't remember his last name.  He wasn't there that long.  You are talking about Brian Woodward.

Q.  Yes.

A.  Brian wasn't the manager at this point.  We did have a Bob, the manager in 2006.

Q.  Let's talk about Brian Woodward who was the person.  I will correct the word.  It wasn't Bob.  I'm saying his name wrong.  It was Brian that you mentioned yesterday.  You stated on the record that Brian Woodward gave you the film?

MR. SHELDON:  Objection. I'm not sure that's what the witness stated.  The question has been asked and answered.

MR. MARSHALL:  If we may research, if we can find her testimony on yesterday about who she stated.

THE COURT: We're not going to do that. That takes way too long, Mr. Marshall.  It may have been asked and answered.  If you put it one more time and let the witness answer. If she doesn't agree with the way the question is posed, she'll answer no.

21

> Q. Brian was in the IT department, was he not?
>
> A. I'm not sure when Brian was hired.  I know we had a Bob just before Brian, and Pattie has worked there all that time.  And it would have gone to the IT department and the manager would have instructed Pattie to get the film.

Tr. at 314-16.

Marshall claims that Rowe's answers during this portion of her testimony were improperly coached by the government's attorneys.  In his Motion, Marshall describes the event as follows:

> Recalling Rowe testimony of the previous day, the Pro Se Defendant inquired of Rowe her receipt of video still photos from Bob Woodward.  In this the Defendant misspoke in calling Brian Woodward, Bob Woodward.  At this juncture and before Rowe could answer the question the Defendant was to hear a tremendous amount of chatter happening over his shoulder.  Wherein he turned and saw both attorney's for the government standing.  However, AUSA Sheldon was audibly saying Bob . . . Bob.  And stopped upon eye contact with the Defendant. . . . Clearly Rowe's swit[c]h to Bob was coached by the AUSA whos[e] actions would undoubtedly be captured on video via the courtroom's (4) cameras.

Mot. for New Trial at 3-4.

Marshall's claim of coaching was not raised by objection at the time, and it is not credible now.  First, because Rowe never testified that she obtained the films from Brian Woodward, there was no reason to coach Rowe to "switch to Bob."  It is apparent from her testimony that she knew that Brian Woodward did not work at Connex at the time in question.  Second, it is not plausible that a "tremendous amount of chatter" occurred, that both prosecutors rose, and that one of the prosecutors audibly said "Bob . . . Bob," all without drawing the attention of the court.  As noted, Marshall made no objection to any of these supposedly extraordinary occurrences.  Thus, Marshall has offered no

credible reason to believe either that Rowe's testimony was false or that it was coached.

Even if Marshall could show that Rowe had committed perjury with respect to her testimony about Bob, this would not be sufficient to warrant a new trial. When alleged perjury is claimed as the basis for the motion for new trial, "not only must [a] defendant demonstrate that the witness committed perjury, but also 'that the jury probably would have acquitted in the absence of the false testimony.'" United States v. Moore, 54 F.3d 92, 99 (2d Cir. 1995) (citations omitted). Marshall is unable to make this second showing. Marshall explored the alleged perjury on cross-examination. In his summation, Marshall attempted to point out the alleged inconsistency in Rowe's testimony and the witness coaching. See Mot. for New Trial at 4 n.1 ("The Defendant was to make further mention of this bizarre and coached response in his closing arguments to the jury."). Therefore, the jury had a full opportunity to assess Rowe's credibility, and Marshall is unable to demonstrate that the jury was misled by the disputed testimony or that the jury "probably would have acquitted in the absence of the 'false' or disputed testimony." Moore, 54 F.3d at 99.

B.    Allegations of Perjury Concerning Rowe's Identification of Marshall

During cross-examination, Rowe testified that, for purposes of Connex's internal fraud investigation, she concluded that Marshall had deposited the forged convenience checks by comparing the photograph on Marshall's driver's license to the photographs she obtained from the Connex security cameras. Marshall claims that, because the driver's license photograph is a headshot, and because the security camera photos are "fuzzy," Rowe was "[c]learly . . . committing perjury and burning drilling this lie into the jury." Mot. for New Trial at 5.

The disputed testimony was elicited by Marshall.  On direct examination, Rowe did not testify that she positively identified Marshall by comparing the photographs.  On direct examination, Rowe identified the copy of Marshall's driver's license that had been provided when the Connex account was opened, and she identified the still photographs showing an individual transacting business at Connex at the time and location when the checks at issue were deposited.  The government did not elicit testimony concerning Rowe's opinion about the identity of the men in the various photographs.[5]  The government, therefore, left it to the jury to determine whether the individual depicted in the surveillance photographs was Marshall.

Rowe's opinion that the individual in the photographs was Kerry Marshall did not come into evidence until it was elicited, apparently intentionally, by Marshall:

> Q.  And did you come to the conclusion that the account belonged to Kerry Marshall or did in your estimation the Postal Inspector -- did you ever make a determination -- did your investigation conclude that it belonged to Kerry Marshall or you didn't know?
>
> A.  We concluded it was Kerry Marshall.  I concluded it was Kerry Marshall due to the photos, due to the signatures, yes.
>
> Q.  Due to the photos and due to the signatures.  What photos exactly are you referring to, Ms. Rowe?
>
> A.  The film from the actual deposits in the branches.
>
> Q.  Good statement.

---

[5] The decision not to elicit such testimony appears to have been deliberate.  At one point during direct examination, Rowe began to volunteer that she had compared the security camera photographs to the driver's license.  Government counsel stopped her at that point and informed her that was not the question.  Tr. at 247 ("I asked whether the exhibit shows <u>an</u> individual conducting a transaction at a teller window at May 30?" (emphasis added)).  Similarly, during its opening statement, the government argued: "The pictures show an individual transacting business at a teller window at Connex Credit Union on the exact dates and the exact times when the account activity at Connex activity for the account held by Kerry Marshall . . . took place. . . . You are going to have to the opportunity to determine for yourselves whether or not the individual in those photographs is, in fact, the Defendant Kerry Marshall."  Tr. at 45-46.

Tr. at 312-13.

Marshall cannot complain that Rowe made this identification when he himself elicited it.  In any case, Rule 701 of the Federal Rules of Evidence permits a lay witness to testify as to opinions and inferences which are "(a) rationally based on the perception of the witness, (b) helpful to . . . the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge . . . ."  Rowe's opinion that the photographs showed Kerry Marshall depositing the forged checks at issue into the Connex account at issue did not require any scientific or specialized knowledge; it was rationally based on Rowe's perception of the photographs and the handwriting; and it was directly relevant to the issue of the defendant's guilt or lack of guilt.  See United States v. White, 639 F.3d 331, 335-36 (7th Cir. 2011) (lay opinion testimony that the defendant was the individual shown in bank surveillance photographs held admissible).  Moreover, there is no basis to conclude that Rowe's testimony in this regard was untruthful or that it in any way affected the integrity of the proceedings or the validity of the jury's finding of guilt.  The jury was able to assess for themselves whether it was Marshall in the photos and to assess the credibility of Rowe's testimony concerning her conclusions about the pictures and handwriting.  See id. ("The jury was free to believe or disregard [the witness's] testimony; the issue of whether the defendant was the same person as the bank robber was left to the jury for its ultimate determination." (quotation omitted)).  Therefore, Rowe's testimony in this regard does not support Marshall's request for a new trial.

      C.     Allegations of Perjury Concerning Subpoenas

Marshall also claims that Rowe committed perjury because her testimony

allegedly conflicted with Inspector Diaz's testimony regarding the issuance of subpoenas to Connex.  Marshall claims that Rowe testified that she had received a subpoena from Inspector Diaz,  while Inspector Diaz testified that he "simpl[y] pressured Rowe that she needed to cooperate."  Mot. for New Trial at 4.

Assuming for the sake of argument that there was such a conflict between Rowe's and Diaz's testimony, that does not establish perjury or the need for a new trial. Sanchez, 969 F.2d at 1415 ("Differences in recollection alone do not add up to perjury"). At best, Marshall has identified a discrepancy to be considered, resolved, or disregarded by the jury as they saw fit.  "It is the function of the jury to resolve any discrepancies in the testimony" of witnesses, and the court need not order a new trial simply because there are discrepencies.  United States v. McCourty, 562 F.3d 458, 476 (2d Cir. 2009).

Marshall cannot make the required showing that the jury "probably would have acquitted in the absence of the 'false' or disputed testimony."  Moore, 54 F.3d at 99. Marshall examined Rowe, Diaz, and witnesses from the other banks concerning the issuance of subpoenas and the release of bank information.  He had ample opportunity to demonstrate any inconsistencies, to impeach the witnesses on that basis, and to argue the issue to the jury, and he sought to do each.  Finally, because the issue of when and whether subpoenas were issued was not directly relevant to the issue of Marshall's guilt or lack of guilt,  it is highly unlikely that any of this allegedly perjured testimony had an impact on the jury's verdict.

D.    Allegations of a Brady Violation

Marshall claims that the government violated "the Brady Act"—presumably

referring to the rule established in <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963)—by failing to turn over two of its trial exhibits prior to trial. Mot. for New Trial at 6-7. The two exhibits are Exhibit 5A, a carbonless copy of the Chase deposit slip for the credit card convenience check at issue in Count Seven, and Exhibit 85, a credit card account statement for one of the individual victims. Both items were seized during the warranted search of Marshall's apartment. The items were not specifically listed on Postal Inspector Diaz's search inventory sheet. Marshall argues that these exhibits "would certainly have influence[d] the jury's guilt determination based upon the location in which the government suggested that they were found. That these items were not present on Inspector Diaz's search warrant inventory sheet is [a] clear indication of the Brady violation and the inflammatory nature of these two exhibits before the jury." Mot. for New Trial at 6.

In <u>Brady</u>, the Supreme Court held that "the suppression by the prosecution of evidence <u>favorable to the accused</u> . . . violates due process where the evidence is material to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87 (emphasis added). "There are three components of a true <u>Brady</u> violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [government,] either willfully or inadvertently; and prejudice must have ensued." <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999). Marshall cannot establish either of the first two elements.

With regard to the first element, the two exhibits are highly inculpatory. Exhibit 85 and the accompanying testimony regarding its location established that Marshall was

in possession of a credit card statement from one of the individual victims. The Indictment charged Marshall with having forged eight separate credit card convenience checks issued to that individual victim. Trial testimony consistently established that such convenience checks were often mailed to account holders in the same envelope as their credit card account statements. The jury could reasonably infer that the explanation for Marshall's possession of that individual victim's account statement was that Marshall had stolen it, and thus had stolen that victim's convenience checks as well. Exhibit 5A and the accompanying testimony regarding its location established that Marshall was in possession of the carbonless copy of the Chase deposit slip for the forged convenience check charged in Count Seven. The jury could reasonably infer that the explanation for Marshall's possession of that copy of the deposit slip was that he had in fact deposited the check charged in Count Seven into the Chase account held in his own name. Marshall himself contends that the exhibits were "inflammatory" and that the exhibits "would certainly have influence[d] the jury's guilt determination based upon the location in which the government suggested that they were found." Mot. for New Trial at 6.

As for any impeachment value, Marshall cross-examined Inspector Diaz at length concerning the fact that these two items were not specifically detailed in the search warrant inventory. Inspector Diaz consistently testified that he seized large stacks of documents, that he listed them under a "bulk" heading for purposes of the inventory, and that he only subsequently analyzed and identified each of the specific documents in those stacks.

With regard to the second element, Marshall has not shown that these exhibits were suppressed. <u>Brady</u> material is not suppressed if it is disclosed in time for its effective use at trial. <u>See</u> <u>United States v. Coppa</u>, 267 F.3d 132, 135 (2d Cir. 2001); <u>Leka v. Portuondo</u>, 257 F.3d 89, 100 (2d Cir. 2001) (timing of disclosure is reviewed based on "the defense's opportunity to use the evidence when disclosure is made;" "Thus disclosure prior to trial is not mandated"). "Evidence is not 'suppressed' if the defendant either knew, . . . or should have known, . . . of the essential facts permitting him to take advantage of any exculpatory evidence." <u>United States v. LeRoy</u>, 687 F.2d 610, 618 (2d Cir. 1982).

Even setting aside the fact that these documents were seized from his own apartment, Marshall knew or should have known that these exhibits were among the government's evidence before trial. The government represents that these two exhibits, and all of the government's other evidence, were made available to Marshall, and to his counsel at the time, as early as February 26, 2007, when the government made its first discovery disclosure pursuant to the Standing Order in this District in the initial case against Marshall. <u>See</u> <u>United States v. Marshall</u>, 3:07-cr-15-JCH (D. Conn.); <u>see</u> <u>also</u> D. Conn. L. Cr. R., App'x: Standing Order on Discovery. The government also represents that, on at least five occasions over the next four years, it sent correspondence reminding Marshall and his attorneys that the evidence was available for their review. The government also represents that, on April 21, 2011, it notified Marshall and Marshall's standby counsel via letter that it had identified its trial exhibits and preliminarily marked them, and invited Marshall and counsel to review the government's exhibits, which included Exhibits 5A and 85. Finally, the court's Pretrial

Order (Doc. No. 95) required the government to provide copies of its exhibits by May 3, 2011, six days prior to trial. The exhibits at issue were contained among the copies provided to the court by May 3, 2011, and Marshall has made no objection that they were not contained among the copies provided to him at that same time.

Marshall objects that such notice and opportunity to review is not sufficient disclosure: "[D]isclosure goes well beyond alleged notice of having possession of evidence. Disclosure clearly entails the simple act of putting three[6] items on a copy machine and providing the Pro Se Defendant a copy so he can prepare for trial." Mot. for New Trial Supp. at 4.[7] As the court advised Marshall at trial, notice and an opportunity to review the evidence is sufficient disclosure. See United States v. Zackson, 6 F.3d 911, 919 (2d Cir. 1993) ("Zackson had sufficient access to the essential facts enabling him to take advantage of any exculpatory material that may have been available . . . ."); LeRoy, 687 F.2d at 619 ("The rationale underlying Brady is not to supply a defendant with all the evidence in the Government's possession which might conceivably assist the preparation of his defense, but to assure that the defendant will not be denied access to exculpatory evidence only known to the Government." (emphasis added)).

Because Marshall has not established a Brady violation, nor that any perjury occurred, Marshall has not shown that a new trial would be in the interests of justice.

---

[6] In his Motion for New Trial Supplement, Marshall mentions a third piece of evidence that he believes was improperly suppressed. He refers to this item only as a "Connex Empty letter." It is not clear to which exhibit Marshall is referring. Marshall does not explain how this item might have had any exculpatory or impeachment value, and he does not contend that it was any less available to him than the two specifically identified exhibits discussed above.

[7] See also Tr. at 602 (Marshall: "The thing is I haven't had the opportunity. In fact, the truth is had they copied it, dropped it on a copier, I wouldn't be able to make this statement.").

Therefore, the Motion for a New Trial is denied.

**V.      CONCLUSION**

For the foregoing reasons, Marshall's Motion to Arrest Judgment (Doc. No. 139),

Motion for Judgment of Acquittal (Doc. No. 140), Motion for a New Trial (Doc. No. 141),

Motion to Arrest Judgment (Supplement) (Doc. No. 145), and Motion for a New Trial

Supplement (Doc. No. 147) are **denied**.

**SO ORDERED.**

Dated at Bridgeport, Connecticut, this 14th day of July, 2011.


 /s/ Janet C. Hall
Janet C. Hall
United States District Judge